# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
November 6, 2001 Session

## STATE OF TENNESSEE v. JASPER EVERETT STEWART

**Direct Appeal from the Circuit Court for Tipton County**
**No. 3794     Joseph H. Walker, Judge**

---

**No. W2000-01752-CCA-R3-CD - Filed January 4, 2002**

---

A Tipton County jury convicted the defendant of first degree felony murder, especially aggravated robbery, and theft under $500.  The trial court sentenced the defendant to concurrent sentences of life with the possibility of parole for first degree felony murder, 20 years for especially aggravated robbery, and 11 months and 29 days for theft.  In this appeal, the defendant contends: (1) the trial court erroneously admitted his tape-recorded telephone calls from the jail and items seized from his residence; (2) the state failed to turn over all tape recordings of his telephone conversations pursuant to his discovery request; (3) the trial court erroneously permitted a state witness to respond to an "open-ended" question in narrative form; and (4) the trial court erroneously neglected to instruct the jury concerning the definition of specific intent.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

F. Glen Sisson (at trial) and K. Jayaraman (at trial and on appeal), Memphis, Tennessee, for the appellant, Jasper Everett Stewart.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; and Elizabeth T. Rice, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

Although the defendant does not challenge the sufficiency of the evidence, we give the following recitation of facts to place the issues in proper perspective.  On March 22, 1999, the defendant entered Lewis Smith's small grocery store near closing time.  The defendant informed Smith that someone was on the hood of a truck in the parking lot.  After closing the store, Smith proceeded outside armed with a pistol and carrying a box of groceries.  He did not see the individual

the defendant described. Smith placed the pistol on the seat of his vehicle while he loaded the groceries. The defendant grabbed the gun and fled.

Sgt. Jerry Dyson responded to a call that evening and saw the body of the deceased victim, a cab driver, on a road near the Tipton County Airport. The victim had been shot in the face. Dyson observed broken glass, a pistol, and the victim's wallet on the scene. The victim's wallet contained no cash, and the cab was not at the scene. The victim's cab with a broken driver's window was found abandoned in a field near the airport the following day. When John Roger Hall, a Tipton County Public Works employee, was returning from lunch that day, he saw the defendant walking down the road towards the airport approximately 3/4 mile from the cab.

The defendant gave a statement to officers. The defendant admitted he had ridden in the victim's cab approximately one month prior, but claimed he did not see the victim on the night of his death. The defendant explained he had visited friends who lived near the airport, but when officers contacted those individuals, they did not corroborate the defendant's claim of alibi.

The defendant's parents authorized a search of the residence, where the defendant also resided, and executed a written consent form. The defendant also verbally consented to a search of his room and executed a written consent to search form. The defendant's mother tendered tennis shoes and a bloody pair of underwear to officers saying the defendant wore them earlier in the day. Officers also found a bloody corduroy jacket and a pair of blue jeans in the bathroom. The defendant stated he found the cab with the window already broken, and he "just got in it and started driving it." The defendant was then placed under arrest.

Captain Timothy Minner was supervisor of the Tipton County Jail, and he was in charge of operating the equipment used to record inmate phone calls. He testified the defendant was warned his phone calls would be recorded. A portion of a phone call made by the defendant to a family member was played to the jury. In it, the defendant conceded, "I did do it, but it was an accident. I was trying to rob the guy."

The defendant testified he had a drug problem which he supported by thefts and drug sales. He said on March 22nd he ingested crack cocaine, crystal methamphetamine, LSD, marijuana, and alcohol. The defendant conceded he took Smith's pistol so he could exchange it for crack.

The defendant said he took the gun to a crack house, but the drug dealers refused to trade for the stolen gun because the defendant was already indebted to them. He later got a cab, which was driven by the victim. He said he subsequently asked the victim to let him out near the airport, but the victim saw the defendant's gun and grabbed for it. He said they struggled for the weapon, and it discharged, shooting the victim in the head. The defendant removed the victim from the cab, placed the stolen gun near him, and took his money and cab. The defendant testified he had no intent to either shoot or rob the victim.

The jury convicted the defendant of felony murder, especially aggravated robbery, and theft of the pistol.

# I. SEIZED ITEMS

The defendant contends his recorded phone conversations and the items seized from the residence should have been suppressed. The issue concerning the phone conversations is waived since the defendant has failed to submit argument, make appropriate references to the record, or cite any authority. Tenn. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); State v. Turner, 919 S.W.2d 346, 358 (Tenn. Crim. App. 1995); *see also* Tenn. R. App. P. 27(a)(7) and (g). The defendant has properly perfected appellate review concerning the items seized from his residence, but we find the seizure was lawful.

## A. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

## B. Suppression Hearing Testimony

At the suppression hearing, the state offered the testimony of Capt. John Fletcher, Lt. Ronnie Coleman, Investigator Scottie Delashmit, and Lt. Tim Minner.

Their testimony established Capt. Fletcher arrived at the defendant's residence at approximately 5:00 p.m. on March 23rd. The defendant voluntarily agreed to be transported to the justice center where he answered questions. During questioning, the defendant asserted several alibis, but when officers contacted the proffered alibi witnesses, they refused to corroborate the defendant's statements. The defendant requested to be transported home, and his request was honored.

Lt. Coleman testified he and Investigator Delashmit entered the residence, told the defendant's parents they were investigating a murder, and requested permission to search. When the defendant's parents inquired why, Lt. Coleman told them "their son's alibi to his whereabouts . . . wasn't adding up." The defendant's parents agreed to the search and executed a written consent form. Additionally, the defendant submitted to a search of his bedroom and executed a written consent form. The defendant's mother then told officers that some items had been washed, and she obtained a pair of tennis shoes and blue jeans from the laundry room. The defendant's mother also handed them a pair of bloody underwear obtained from the bathroom. Investigator Scottie Delashmit corroborated Coleman's testimony.

The defendant's mother testified officers arrived at approximately 5:00 p.m. on March 23rd and asked to speak with the defendant. They informed her "they were checking on some incident," but they did not tell her they were investigating a murder. The officers asked the defendant if he would come with them to the station, to which he agreed. She said the officers returned an hour later with the defendant in the back of the patrol car. They inquired if they could conduct a search of the residence, to which she agreed and executed a written consent form. She testified she was not informed officers were looking for evidence concerning a murder, and if she had been informed, she would not have granted them permission to search. On cross-examination, she conceded she tendered to the officers bloody underwear and told officers the defendant had washed some items.

## C. Analysis

A well-settled exception to the warrant requirement is a search conducted pursuant to consent. State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996). The determination of whether a consent to search was voluntarily given is a question of fact to be determined from the totality of the circumstances. State v. McCrary, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000). The trial court entered detailed written findings, concluding the consent given by the defendant and his parents was voluntarily and knowingly given without deception or coercion. The evidence does not preponderate against this finding. This issue is without merit.

## II. TAPE RECORDINGS

The defendant contends the state violated Tenn. R. Crim. P. 16 by failing to provide the defendant with copies of all his tape-recorded telephone conversations pursuant to his discovery request. We are unable to find a discovery violation.

Tenn. R. Crim. P. 16(a)(1)(A) provides:

> Upon request of a defendant the State shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known, to the district attorney general . . . .

The defendant contends the state provided him with only two tapes containing his recorded conversations, and the state possessed additional tapes. In furtherance of his position, he cites the testimony of Captain Minner as follows:

Question: [D]o you know . . . how many conversations you tape recorded, do you know?
Answer: I think I said approximately six or seven. I cannot exactly recall.
Question: And did you provide those six or seven tape recordings to the counsel for the state, to the District Attorney General?

Answer: I believe the District Attorney had access to the tapes. I don't really know. I think I turned them over to Captain Fletcher.
Question: Six tapes, are you saying?
Answer: No, no. Several conversations were on two tapes, I believe.

During a bench conference, the defendant argued "the witness has stated that he recorded six different conversations, and there are only two tapes which I remember to have received . . . ." The state informed the court that the defense was provided with a copy of all tape recordings, which the trial court implicitly found.

Based upon the record before us, we are unable to disturb the ruling of the trial court. Captain Minner testified six or seven conversations were recorded on two tapes. The prosecuting attorney stated all tapes were provided to defense counsel. Although the defendant alleges there were recorded conversations not provided to him, we find no authority in the record to support his position. This issue is without merit.

## III. NARRATIVE TESTIMONY

During the testimony of the medical examiner, Dr. O'Brian C. Smith, the state inquired:

> Next, would you please describe to the jury the conduct of your autopsy and tell them about the gunshot wounds, this near gunshot wound, where it entered, where it left the body, whether you recovered the bullet? I think it would be easier, instead of my asking questions, just to let you go ahead and tell them what you know about this.

After a response by Dr. Smith covering approximately 55 lines in the record, the defendant lodged the following objection: "Your Honor, at this point I would object, Your Honor. The question [sic] is not responsive." The trial court overruled the objection. Defendant now contends the question was improper because it was an "open-ended" question calling for a narrative response.

Tenn. R. Evid. 611(a) provides, "[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." We recognize that

> [t]he problem with these expansive queries is that they allow the witness to bring in much irrelevant information and do not give opposing counsel any hint that the witness may be entering forbidden territory.
>
> Courts differ markedly in their receptivity to these questions. Some allow them and others do not. Under Rule 611(a), however,

-5-

judges should allow counsel to present evidence and conduct the trial until counsel abuses its responsibility. This means that counsel should be permitted to elicit narrative questions that do not unduly waste time or do not encourage the jury to hear inadmissible evidence.

Neil P. Cohen, et al., **Tennessee Law of Evidence** § 6.11[8] (4th ed. 2000).

A condition precedent to appellate review of this alleged error is "a timely objection . . . stating the specific ground." Tenn. R. Evid. 103(a)(1). The defendant's objection at trial was that the answer was unresponsive, which the trial court overruled. On appeal, the defendant now contends the state asked a compound question that invoked an improper narrative response. Since an appellant cannot change theories from the trial court to the appellate court, this issue could be considered waived. State v. Dooley, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). Nevertheless, we will address it.

The propriety, scope, manner and control of the examination of witnesses are within the sound discretion of the trial court. State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992). Here, we find no abuse of discretion by the trial court. The narrative response by the expert witness was not a waste of time, was relevant, and did not contain inadmissible evidence. This issue lacks merit.


## IV. JURY INSTRUCTIONS

The defendant contends the trial court erred by failing to define the "specific intent" requirement for felony murder; namely, the specific intent to commit the underlying felony of robbery. The state contends the trial court fully and fairly stated the law. We agree with the state.

### A. Jury Charge

The relevant portion of the jury instruction is as follows:

> Any person who commits a first degree murder is guilty of a crime.

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) that the defendant unlawfully killed the alleged victim; and

> (2) that the killing was committed in perpetration of or the attempt to perpetrate the alleged robbery; that is, that the killing was

-6-

closely connected to the alleged robbery and was not a separate, distinct, and independent event; and

(3) that the defendant intended to commit the alleged robbery.

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or the result of the conduct when the person's conscious objective or desire is to engage in the conduct or cause the result.

Immediately thereafter, the trial court instructed the jury as to the elements of robbery.

## B. Analysis

The jury charge was based upon pattern jury instructions. *See* T.P.I.-CRIM. 7.03(b) (5th ed. 2000). However, pattern jury instructions are merely patterns or suggestions and have not been officially approved by an appellate court or the general assembly. State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997). Reliance upon an erroneous pattern jury instruction does not alleviate error.

Our supreme court has recently addressed the issue of the necessity of special jury instructions. It stated that "[t]he proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). We will reverse the denial of such a charge "only if the jury was unfairly instructed on the legal issues or was misled regarding the applicable law." *Id.* Denial of a special request is error only if the trial court's charge does not fully and fairly state the applicable law. State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). If the instructions fully and fairly state the law, any special request for further instructions should be in writing. *See* Tenn. R. Crim. P. 30(a); Lackey v. State, 578 S.W.2d 101, 108 (Tenn. Crim. App. 1978).

In this case we conclude use of the pattern jury instruction was proper. After the jury charge, the defendant orally requested a special jury instruction on the "[d]efinition of specific intent as opposed to general intent." A written request was never submitted to the trial court, nor has the defendant set forth a proposed jury instruction in his brief in this court. We find no inaccuracy in the pattern jury charge. It advised the jury the defendant must have "intended to commit the alleged robbery." It further defined the elements of robbery. There was no reason for any additional instructions.

## CONCLUSION

Based upon our examination of the record, we affirm the judgments of the trial court.

_____
JOE G. RILEY, JUDGE