# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
## Assigned on Briefs October 13, 2020

## STATE OF TENNESSEE v. RONALD D. McCALLUM, JR.

**Appeal from the Criminal Court for Davidson County
No. 2016-B-2336   Angelita Blackshear Dalton, Judge**

### No. M2019-02287-CCA-R3-CD

The Defendant, Ronald D. McCallum, Jr., was convicted by a Davidson County Criminal Court jury of two counts of aggravated robbery, a Class B felony, and vandalism, a Class A misdemeanor.  *See* T.C.A. § 39-13-402 (2018) (aggravated robbery); § 39-14-408 (2018) (vandalism); § 39-14-105 (2018) (grading for vandalism).  The trial court sentenced the Defendant as a Range I, standard offender to ten years' confinement at 85% service for each aggravated robbery conviction and to eleven months, twenty-nine days for the vandalism conviction. The court imposed partial consecutive service, for an effective twenty-year sentence at 85% service.  On appeal, the Defendant contends that the prosecutor engaged in misconduct during her closing argument.  We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Jay Umerley (on appeal) and Kyle Parks (at trial), Nashville, Tennessee, for the appellant, Ronald D. McCallum, Jr.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn Funk, District Attorney General; and Amy Hunter and Addie Askew, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the armed robberies of Selvin Perdomo and Famara Diedhiou and to the failed attempt to break into an automated teller machine (ATM).  The Defendant and two codefendants, Paige Hammonds and Brennan Lee, were charged in connection with the offenses, and the Defendant and codefendant Lee were tried jointly.

At the trial, Joseph Ward testified that on June 22, 2016, at 5:00 a.m., he left home to play hockey at the Ford Ice Center but stopped at Regions Bank to deposit money at the ATM. He said that another car was at the ATM when he arrived, that he pulled over and waited, that he saw two African-American men standing outside of the car, and that the men got in the car when the men noticed him. Mr. Ward described the car as a black sedan and recalled that the men wore red bandanas and baseball caps. Mr. Ward said that the black sedan drove away, that he drove up to the ATM, and that he noticed it was damaged and that debris was on the ground. As Mr. Ward attempted to follow the sedan to obtain a license plate number, the driver of the sedan had "turned the car around . . . nose-to-nose and had [him] boxed in." However, Mr. Ward was able to drive around the sedan and get away without further incident. Mr. Ward was unable to identify the men.

Selvin Perdomo testified that on June 22, 2016, at 5:00 a.m., he left his apartment to go to work. Mr. Perdomo started his car. As he leaned over the trunk dealing with tools, a dark-colored, four-door sedan stopped, and two men left the car. Mr. Perdomo said that one of the men pointed a firearm at his face and that the other man slapped him and asked for his money. Mr. Perdomo described the men as tall African-American men, who had their faces covered with bandanas. When Mr. Perdomo did not produce enough money, one of the men turned off the engine of Mr. Perdomo's car and searched inside for additional money. The men took Mr. Perdomo's cell phone and wallet, which contained about $235, threw Mr. Perdomo's car keys into the parking lot, and left. The man who held the gun took Mr. Perdomo's wallet. Mr. Perdomo said that the men drove toward another apartment building and that after he retrieved his car keys, he heard someone scream. Mr. Perdomo's jaw hurt for three days after being struck. Mr. Perdomo said that about two or three minutes before the robbery, he heard gunshots while he prepared his morning coffee. The Regions Bank location at which Mr. Ward had been was near Mr. Perdomo's apartment complex. Mr. Perdomo could not identify the perpetrators.

Famara Diedhiou testified that on June 22, 2016, around 6:00 a.m., he was outside his apartment cleaning out the trunk of his car. Other evidence showed that Mr. Diedhiou and Mr. Perdomo lived at the same apartment complex. Mr. Diedhiou heard four or five gunshots. About fifteen minutes later, two men approached Mr. Diedhiou, pointed a gun at Mr. Diedhiou's stomach, and demanded "everything you have." The men punched Mr. Diedhiou on the head, Mr. Diedhiou fell, and the men kicked Mr. Diedhiou. While on the ground, the men searched Mr. Diedhiou's pants pockets and took a cell phone. The men, likewise, searched Mr. Diedhiou's car. Mr. Diedhiou said that the man with the gun wore a white shirt, black pants, and red shoes. Both men wore face coverings, and they left behind a cell phone. Other evidence showed that the phone left behind belonged to Mr. Perdomo. Sometime after the robbery, Mr. Diedhiou saw a television news report about the incident at Regions Bank. Mr. Diedhiou said that the men featured in the news report were the same men who robbed him because the men wore the same clothes and bandanas.

Judy West, her mother, and her daughter, Kayla Evans, lived at the apartment complex where the robberies occurred. On June 22, 2016, at 5:30 a.m., Ms. West saw a news report about the ATM vandalism and noticed that the car described in the report looked like her mother's car, which at the time was a Chevy Cruze. Ms. West noticed that the car was not in the parking lot but that the car "came pulling up," along with a second car, around 6:00 or 6:30 a.m. Ms. West saw two men get out of her mother's car, remove items from the car, and place items in the woods in front of her apartment. She saw the two men throw a license plate into the dumpster and leave in the second car. She could not identify the men. Ms. West learned later that Ms. Evans had loaned the car to one of the men.

Kayla Evans testified that on June 21, 2016, the Defendant asked to borrow the Chevy Cruze she shared with her grandmother. The Defendant, codefendant Lee, and codefendant Hammonds picked up the car between 1:00 and 2:00 a.m. She received a telephone call from one of the men just before the car was returned. She went to the parking lot to retrieve the keys, and codefendant Hammonds gave them to her. The Defendant, codefendant Lee, and codefendant Hammonds retrieved items from the car and left in a separate car. Ms. Evans later found a crowbar, a license plate, a wallet, and water bottles inside her car, and she placed the items in the dumpster outside of her apartment.

Metropolitan Nashville Police Officer Steven Jones collected fingerprint evidence and took photographs at the robbery scenes. At Regions Bank, the front of the ATM had been torn off, and it had been shot with a shotgun. A crowbar was found, along with fired and unfired shotgun shell casings. The video camera inside the ATM was not damaged. Officer Jones photographed injuries sustained by the robbery victims. The collection of fingerprint evidence at the ATM was not possible because the surveillance recording showed that the perpetrators wore gloves.

Metropolitan Nashville Police Officer Kayla Fulton collected evidence from a dark blue Chevy Cruze, which was found one day after the robberies and the vandalism. The car was likewise processed for the presence of DNA and fingerprint evidence. She collected evidence found in "a woodline across the way from" the car and from the surrounding area. The evidence collected included two black fabric gloves, a solo cup, paperwork, a pack of gum, four bandanas, a proof of insurance card belonging to Mr. Diedhiou, and a plastic wrapper that had previously contained bandanas. She also collected evidence from a nearby dumpster, which contained two plastic bags. Inside the bags were an empty box of twelve-gauge shotgun shells, a cigarette butt, a torn Tylenol wrapper, two Walmart receipts, a Tennessee license plate reflecting number U3807N, a crowbar, an electronic "car adapter" cord, five empty water bottles, an empty pack of cigarettes, two compression sleeves, and a wallet containing Mr. Perdomo's identification.

Codefendant Paige Hammonds testified that he knew the Defendant and codefendant Lee. On June 22, 2016, codefendant Hammonds borrowed a dark blue Chevy Cruze from Ms. Evans. Two people were with codefendant Hammonds. Initially, he said he had forgotten the names of the people who were with him but later said the two people had been murdered. He said he was under the influence of Xanax when he spoke to the investigating police officers, although he recalled speaking to them about the vandalism and the two robberies. Later, codefendant Hammonds testified that he, the Defendant, and codefendant Lee were involved with these incidents and that a shotgun was used against the ATM. Codefendant Hammonds said it was his idea to vandalize the ATM. He did not recall telling the police that "it [was] a hostage situation," in which he went along with what other people wanted. He said that he fired the gun at the ATM and did not recall telling the police anything different. He denied that the Defendant and codefendant Lee picked him up at 3:00 a.m. on July 22, 2016, that the Defendant was inside the car, and that codefendant Lee drove the car. Codefendant Hammonds said that he robbed the victims at gunpoint, that he punched one victim, and that the Defendant and codefendant Lee were not with him. Codefendant Hammonds said that after he returned to Ms. Evans's apartment, he placed some things in the woodline area. He said, though, he lied to the police when he stated that the Defendant and codefendant Lee were involved in the robberies and the vandalism.

Codefendant Hammond's police interview was played for the jury as a prior inconsistent statement, in which he implicated the Defendant and codefendant Lee as participants in the ATM vandalism and the two robberies. Codefendant Hammonds identified himself in photographs taken from the ATM surveillance recording and stated the vandalism occurred before the two robberies. Codefendant Hammonds provided descriptions of the robbery victims.

Metropolitan Nashville Police Detective Brandon Dozier lead the investigation in this case. Although the surveillance camera inside the ATM was not damaged and recorded the vandalism, the machine was "severely damaged." The recording was played for the jury and showed a dark four-door Chevy Cruze approach the ATM at 5:21 a.m. The rear passenger and front passenger left the car, and the driver threw two bags from the open driver's window. The driver pointed a shotgun at the ATM and fired four to five times, and the two passengers attempted to pry open the ATM's casing. All of the car's occupants were male, and they wore gloves and face coverings. The driver left the car and fired the shotgun at the ATM, and the two passengers continued using an object to pry open the ATM. After they were unsuccessful at gaining access to the ATM, the men left at 5:49 a.m. Other evidence showed that the license plate number on the car was registered to a different car. Detective Dozier stated that the Regions Bank where the vandalism occurred was located near the rear entrance of the apartment complex, that it would have taken

seconds for the driver of the car at the ATM to drive to the location of the robberies, and that the robberies occurred quickly.

Walmart receipts recovered from the dumpster outside of Ms. Evans's apartment were received as an exhibit and reflected purchases at 4:22 a.m. and 4:23 a.m. of gloves, a duffle bag, and Dasani water. Surveillance recordings from Walmart reflected the individuals who purchased the items. During her police interview, Ms. Evans identified codefendant Hammonds and the Defendant in the Walmart recordings. Codefendant Lee was not identified in the recordings. Other evidence showed that Walmart was about a five-minute drive from Regions Bank and the apartment complex where the robberies occurred.

Cell phone records belonging to the Defendant, codefendant Lee, and Ms. Evans were received as an exhibit and reflected that the Defendant and Ms. Evans first communicated around 12:10 a.m. on June 22, 2016. The records showed forty attempted and completed calls from Ms. Evans's phone to the Defendant's phone. Likewise, the records reflected five attempted and completed calls from the Defendant's phone to Ms. Evans's phone. The records showed that codefendant Lee and Ms. Evans communicated six times. Cell phone tower data showed that the Defendant's and codefendant Lee's phones used towers near Regions Bank and the apartment complex at the time of the offenses.

Fingerprint evidence reflected codefendant Hammond's fingerprints on the clear wrapper that previously contained bandanas. The Defendant was excluded as the contributor of some fingerprints that were analyzed but could not be excluded as the contributor of other fingerprints on the items submitted for analysis. DNA evidence reflected that the Defendant's DNA was found on the cigarette butt submitted for analysis.

Upon this evidence, the jury found the Defendant guilty of two counts of aggravated robbery and misdemeanor vandalism. The trial court sentenced him to an effective twenty years' confinement at 85% service. This appeal followed.

The Defendant contends that the prosecutor committed misconduct during closing argument. He argues that the prosecutor improperly expressed an opinion about the Defendant's identity as one of the perpetrators. The State responds that the Defendant has waived appellate review by failing to object contemporaneously at the trial and, alternatively, that the prosecutor did not engage in misconduct.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing

argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.
>
> Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The record reflects the following during the prosecutor's closing argument regarding the Defendant's identity:

> . . . I want to start with Ronald McCallum. The first thing that the State would submit showed that this defendant, Ronald McCallum is the person who committed the offense and it is the State's position that the defendant is the one who was wearing the black t-shirt in the Walmart video and who was wearing the black hoodie in the Regions video.
>
> We know that because of the testimony of or we know that this defendant is involved because of the testimony of Kayla Evans. She has known Ronald McCallum forever, sometimes she calls him G. Ronald, sometimes she calls him G, and sometimes she just calls him Ronald, but she has known him for a really long time and she testified that he called her the night before all of this. He called her [in] the early morning hours that it actually happened and he actually came to her house.
>
> He is the one who along with Brennan Lee got the keys to her vehicle. He is the one who left in her vehicle. He is the one who returned in her vehicle and he is the one who texted her afterwards and had all of those text messages that she showed to Detective Dozier about what is happening, are you the one who told the police or something to that affect, so we know that by her testimony.
>
> We know that it was been this defendant who committed these offenses, Ronald McCallum, because he is on the video purchasing the very supplies that he used to conceal his, Brennan Lee's, Paige Hammond's identity during this offense.

The Defendant argues that the prosecutor improperly commented on his identity by concluding that he was depicted in the Walmart surveillance recordings. He asserts that the statement was prejudicial and that it was "solely the jury's job to determine the identity of someone in a photograph." Although the Defendant raised this issue in his motion for new trial, he concedes that he did not object contemporaneously during the closing argument. *See* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The State contends that the Defendant has waived consideration of this issue because he failed to object contemporaneously and, alternatively, that the prosecutor did not engage in misconduct. The Defendant has not addressed the State's waiver argument.

Any waiver notwithstanding, the Defendant is not entitled to relief because the prosecutor did not engage in misconduct. The prosecutor's statement about the Defendant's identity was based upon the surveillance recordings and Ms. Evans's testimony that the Defendant was depicted in the recordings. The prosecutor connected additional evidence to argue the Defendant's identity as a perpetrator had been established. The prosecutor did not provide the jury with her personal opinion. Rather, she argued the logical inferences to be drawn from the evidence.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE